IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MOHAMAD FARVARDIN, | : | |
|     Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 12-6680 |
| | : | |
| TPR. MICHAEL SANTOS, et al., | : | |
|     Defendants. | : | |
| | : | |

## ADJUDICATION

Rufe, J.                                                                               December 15, 2014

      Mohamad Farvardin filed a civil rights complaint against the Pennsylvania State Police (PSP) troopers involved in an October 28, 2011 incident, and against PSP Commissioner FRanck Noonan. Prior to trial, Dr. Farvardin settled his claims against the state trooper defendants for monetary damages, but did not settle his claim for injunctive relief against Commissioner Noonan. The Court held a bench trial, at which it heard evidence regarding Dr. Farvardin's claim that Commissioner Noonan failed to properly train and educate state troopers, and failed to correct violations of law. The Court now makes findings of fact and conclusions of law.

**I.**      **Findings of Fact**

A.      The Incident

1.      Mohamad Farvardin is 68 years old. He was born in Iran but has been an American citizen for about 35 years. He speaks English with a foreign accent.

2.      Dr. Farvardin holds a Ph.D. in civil engineering, and currently works as a consultant in water treatment and waste water management.

3.      On October 28, 2011, he was driving his car on Route 841 in Chester County, Pennsylvania when he received a telephone call from a client.

4. Dr. Farvardin moved his vehicle completely off the roadway and parked it to take the telephone call.

5. A passing motorist called the police to report seeing a vehicle parked with the driver slumped over the steering wheel, and Pennsylvania State Police (PSP) Trooper Sromovsky was sent to check on the well-being of the driver.

6. Approximately 10-15 minutes later, while Dr. Farvardin was still on the telephone call, Trooper Sromovsky pulled up behind him.

7. Trooper Sromovsky has been employed as a trooper by the PSP since 2007.

8. Trooper Sromovsky walked up to Dr. Farvardin's car window, knocked on it, and began talking to Dr. Farvardin.

9. Trooper Sromovsky told Dr. Farvardin that someone had reported seeing him slumped over the steering wheel of his car. Dr. Farvardin indicated that he was fine and there was no problem. Trooper Sromovsky observed that Dr. Farvardin was talking on the telephone and appeared in good health.

10. At that point, Trooper Sromovsky had completed the task for which he had been dispatched: to check the status of the driver, Dr. Farvardin. Nevertheless, he continued the encounter.

11. Despite his testimony that he believed he would need to identify Dr. Farvardin for a dispatch report, Trooper Sromovsky never asked Dr. Farvardin for his name.

12. Although he had no cause to detain or arrest Dr. Farvardin, Trooper Sromovsky did not behave as though Dr. Farvardin was free to leave nor could Dr. Farvardin decline to interact with him.

13. Trooper Sromovsky demanded that Dr. Farvardin discontinue his telephone call, which

he did, and to exit his car, which he also did.

14. Trooper Sromovsky asked Dr. Farvardin to show him identification. Dr. Farvardin refused to display his identification, insisting that he had done nothing wrong and was therefore not required to show his license. Trooper Sromovsky again demanded identification.

15. At some point early in their encounter, Trooper Sromovsky turned on the audio and video recording equipment in the police vehicle, and recorded the remainder of the encounter.

16. This was done in response to Dr. Farvardin accusing Trooper Sromovsky of asking him for identification only because of his appearance and foreign accent.

17. Trooper Sromovsky told his supervisor, Corporal Ranck, and later noted in his report, that he turned on the camera because Dr. Farvardin had "played the race card." Trooper Sromovsky testified that he would not report that an individual with a French or Swedish accent was "playing the race card" if they made a similar remark, indicating that he was responding to Dr. Farvardin's skin color as well as his accent.

18. Multiple times, Trooper Sromovksy told Dr. Farvardin that he would be arrested for disorderly conduct if he did not produce his identification.

19. Trooper Sromovsky has not, on any other occasion, arrested someone or heard of anyone being arrested for failing to produce a license, although he has written traffic citations for failure to produce a license upon request.

20. Disorderly conduct is generally a summary offense, resulting in the issuance of a citation or summons, and alone is not generally grounds for arrest.[1]

21. After being detained unwillingly, removed from his vehicle, and threatened with arrest,

---

[1] 18 Pa. C.S.A. § 5503.

> Dr. Farvardin pulled out his license and tossed it on the ground, saying "this is ridiculous, this is ridiculous, here take this." He was angry at being treated disrespectfully, forced to discontinue his call, exit his car, and show identification to the police without legal justification.

22. Immediately after Dr. Farvardin threw his license on the ground, two officers, Trooper Sromovsky and Trooper Santos, who arrived in a second state police vehicle at some point after hearing a police radio report of a man slumped over the steering wheel, pushed Dr. Farvardin to the ground on his stomach, with his hands pulled behind him so that he could not break his fall, causing him to cut and scrape his nose and forehead on the asphalt. They then handcuffed him with his hands behind his back, causing him to scream in pain.

23. Dr. Farvardin was directed to remain seated on the ground and was told he would be cited for disorderly conduct because of his "little temper tantrum."

24. The officers called for an ambulance. When the ambulance arrived, the officers removed the handcuffs. Dr. Farvardin refused to enter the ambulance for medical attention, because he wanted to take pictures to document his injuries prior to treatment, and the emergency medical personnel would not agree to this.

25. Trooper Srovomsky summoned his supervisor, Corporal Ranck, to the scene.

26. Until Corporal Ranck arrived, the officers were telling Dr. Farvardin that he would be cited for disorderly conduct, and then allowed to leave in his own car.

27. When supervisor Corporal Ranck arrived, Trooper Sromovsky told Corporal Ranck he intended to charge Dr. Farvardin with disorderly conduct as a summary offense. Corporal Ranck spoke briefly with Dr. Farvardin, and told Dr. Farvardin he would be issued a

citation for disorderly conduct.

28. Corporal Ranck then reviewed the video tape, noted aloud that Plaintiff's name was Mohammad Farvardin, and then instructed the officers to arrest Dr. Farvardin for resisting arrest, a misdemeanor, which the officers did.

29. Dr. Farvardin was again placed in handcuffs, and placed in the backseat of a police car.

30. The police then searched Dr. Farvardin's car, opening his tool box and other boxes, looking in the console, glove compartment, and pockets of the car, and took an inventory of his possessions.

31. Later, Trooper Sromovsky completed an affidavit of probable cause, swearing under oath that Dr. Farvardin engaged in conduct which created a substantial risk of bodily harm to a public servant and which required substantial force to overcome, in the course of a lawful arrest. The video tape of the encounter demonstrates that these statements were not true.

32. Dr. Farvardin was taken to the police barracks and handcuffed to the wall, standing up.

33. Because he was charged with a second degree misdemeanor, Dr. Farvardin should have been released with a summons, pursuant to Rule 519. Corporal Ranck made the decision not to release him but to have him arraigned.

34. Later that afternoon, he was taken before a judge, posted bail, and released. He then had to pay $125 to retrieve his car, which had been towed.

35. The Chester County District Attorney's Office determined that Trooper Sromovsky's encounter with Dr. Farvardin was a "mere encounter" between an officer and a citizen, and not an investigatory stop, as the officer was not investigating the report of a crime and he did not believe there was a crime in progress; as such, Dr. Farvardin was not required to produce his identification in response to Trooper Sromovsky's request. Thus,

the District Attorney's Office refused to prosecute the charges against Dr. Farvardin and the charges against him were dismissed.

B. Trooper Training

36. Trooper Sromovsky attended the PSP Academy in 2007. PSP cadet training involves 27 weeks of training in firearms, physical fitness, traffic law, criminal law, rules of criminal procedure, and other subjects.

37. Cadets are provided with training on the Fourth Amendment, including instruction on the rights of individuals and the limits on police authority in mere encounters, investigatory detentions, and custodial detentions.

38. Trooper Sromovsky and Corporal Ranck were able to recite what a citizen's rights are in a mere encounter during the trial. Both testified that in a mere encounter, an officer may ask an individual for identification but the citizen cannot be detained for refusal to provide that identification or answer questions.

39. Trooper Sromovsky testified that he now understands that an officer may not arrest a citizen under the circumstances presented in this case, but he did not understand this at the time of the incident.

40. Despite the ability to recite the limits on police authority during a mere encounter, Corporal Ranck testified that he felt Trooper Sromovsky handled the mere encounter with Dr. Farvardin professionally and politely, despite the fact that Trooper Sromovsky detained Dr. Farvardin after ascertaining that he was not in need of medical assistance, repeatedly demanded he produce identification, threatened him with arrest for non-compliance with that demand, used physical force against Dr. Farvardin, and then handcuffed him after Dr. Farvardin threw his license on the ground.

41. Trooper Sromovksy believed that his encounter with Dr. Farvardin was something more than a mere encounter because he was dispatched to the scene, although he had received no information indicating that Dr. Farvardin had committed a crime. He believed he was required to review Dr. Farvardin's identification in order to complete his report.

42. Sergeant Philip Duffy is a supervisor of the Criminal Law Unit of the PSP Academy, and a certified instructor at the Academy.

43. Among other topics, Sergeant Duffy provides instruction to prospective troopers on the distinctions between mere encounters, investigative stops, and custodial arrests. He testified that all instructors use the same materials and standards in teaching cadets.

44. Sergeant Duffy testified that prospective state troopers are taught the laws governing mere encounters, investigatory detentions, and custodial arrests while at the Police Academy.

45. Sergeant Duffy instructs students that in a mere encounter, where the officer has no reasonable suspicion that a person is involved in criminal activity, the officer has no recourse if that person opts not to interact with the police or wishes to leave.

46. Sergeant Duffy testified that Trooper Sromovsky's encounter with Dr. Farvardin fell into some "grey area" between a mere encounter and an investigative stop, although the trooper was not called to the scene in response to a report of criminal activity, but rather to check on the safety of individual.

47. The PSP have not changed their curriculum or training regarding mere encounters since the Dr. Farvardin incident.

48. Harry McCann, director of law enforcement training for the County of Bucks, testified as an expert for Plaintiff. He opined that after Trooper Sromovsky found Dr. Farvardin was

talking on the telephone and in good health, Trooper Sromovsky had the opportunity and the duty to walk away. His follow-up, based on his own misunderstanding of his duty and his authority, escalated a mere encounter into an investigatory detention and ultimately an arrest.

49. Mr. McCann also opined that additional training on identifying and correctly handling different types of encounters should be implemented in response to this event. To ensure that the training is effective in improving the police culture, Mr. McCann recommends that training be required for both troopers and supervisors, so that classroom lessons and supervisor expectations are consistent.

50. Mr. McCann also opined that the training should occur over a one-year period and should use the videotape of the encounter with Dr. Farvardin as a training example.

C. <u>Internal Affairs Procedures</u>

51. Major Robert Evanchick oversees the Internal Affairs Division of the Pennsylvania State Police Bureau of Integrity and Professional Standards ("IAD").

52. An internal investigation of police conduct is generally initiated by a citizen's complaint, which can be submitted in person, by phone, in writing, or over the internet.

53. After a complaint is made, it is forwarded to a captain of the Internal Affairs Division. The captain reviews the complaint and determines whether it warrants an Internal Affairs investigation.

54. If an allegation is assigned to an investigator, that investigator will interview the complaining party, any witnesses, and the subjects of the complaint.

55. Once the investigation is completed, the investigator prepares a written report, attaching all documentary evidence, and audiotapes of all interviews. The report should not contain

conclusions, opinions, or recommendations.

56. The lieutenant reviews the report, after which it is reviewed by the captain.

57. It is then sent for adjudication to the subject's Troop Commander or bureau director.

58. The Area Commander reviews the adjudication recommendation. If the Area Commander and the Troop Commander concur, there is no further process. If they cannot concur, the report is reviewed by the Deputy Commissioner.

59. If the allegations in the complaint are sustained, there may be a Disciplinary Action Report. Another division, the Department Discipline Office, determines what penalty or disciplinary action will be imposed.

60. If the target files a grievance regarding the discipline recommended, the matter is sent to arbitration with a neutral arbitrator.

61. Dr. Farvardin's attorney filed a complaint on his behalf with the Pennsylvania State Police Office of Chief Counsel, alleging violations of Dr. Farvardin's civil rights. The Office of Chief Counsel ordered a full investigation.

62. The IAD did not conduct a typical IAD investigation and adjudication of Dr. Farvardin's complaint against Troopers Sromovsky and Santos and Corporal Ranck; instead, the IAD conducted an "attorney work product" investigation for the Office of Chief Counsel, for the sole purpose of mounting a defense in anticipated civil rights litigation. This was not reviewed according to the typical protocol for administration of citizen complaints, and the report was never adjudicated. The intent of the investigation was not to investigate and, if necessary, correct alleged wrongdoing, but to prepare for civil litigation.

63. Trooper Sromovsky gave his account of the events to an IAD officer. Trooper Sromovsky is not aware of whether his recitation of the relevant events was corroborated in any way

by the IAD.

64. The IAD found no wrongdoing by the Troopers, and made no recommendations.

65. The IAD report was given to the Chief Counsel's office. No other investigation was conducted.

66. Dr. Farvardin's expert, Mr. McCann, opined that the failure to find and remediate wrongdoing in this instance indicates a cultural problem within the state police.

67. Mr. McCann opined that when there is a mechanism for review of events by an outside agency (the District Attorney's Office, a citizen review board, or some other agency), it can be effective in establishing a cultural change within a police department.

68. The relevant PSP policy was revised in March 2014; now, allegations of misconduct which appear to be founded trigger a full IAD investigation and adjudication, even if the Office of Chief Counsel requests an attorney work product investigation in anticipation of potential civil litigation.

69. Major Evanchick acknowledged that in this case, a prosecutor declined to prosecute the charges against Dr. Farvardin, and attached a legal memorandum explaining that the state police had mishandled a mere encounter with Dr. Farvardin, but nothing further was done to address the incident.

70. Major Evanchick acknowledged that the troopers' conduct towards Dr. Farvardin was problematic, and indicated that he would share relevant information about the incident with the Bureau of Training and Education after the litigation has concluded.

**II.  Conclusions of Law**

The Court previously ruled that there is an actual case and controversy before the Court,

and the Court has subject matter jurisdiction over Dr. Farvardin's claim for injunctive relief.[2] Although Defendant raises this issue again in his proposed findings of fact and conclusions of law, the Court will not revisit this settled issue.

The Court then turns to Dr. Farvardin's argument that Defendant Noonan violated his constitutional rights by failing to adequately train, supervise, and discipline state troopers under his command with regard to the correct categorization of encounters as mere encounters, investigative stops, and custodial arrests, and with regard to the rights of citizens and the limitations on police power in these different types of encounters. To establish a claim under 42 U.S.C. § 1983, Dr. Farvardin must demonstrate that Commissioner Noonan, acting under color of state law, deprived him of a federal right. Commissioner Noonan does not dispute that he acts under color of state law as the commissioner of the PSP. The issue, then, is whether Dr. Farvardin was deprived of a federal right. In this case, Dr. Farvardin must prove by a preponderance of the evidence that Commissioner Noonan failed to provide for adequate training, supervision, and discipline of state troopers with regard to the fourth amendment rights of citizens, and manifested a deliberate indifference to the rights of citizens with whom the poorly trained PSP troopers would interact.[3] Dr. Farvardin must also establish a causal nexus between the failure to train and his constitutional injury.[4]

A.     Failure to Train and Causal Nexus

Dr. Farvardin argues that Commissioner Noonan failed to provide adequate training to state troopers, leaving them unable to correctly categorize encounters as mere encounters, investigative stops, or custodial arrests, and unlikely to recognize the limitations on their

---

[2] Memorandum Opinion and Order dated October 21, 2014.

[3] *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).

[4] *Thomas v. Cumberland Cnty,* 749 F.3d 217, 226 (3d Cir. 2014).

authority in a mere encounter in which a citizen declines to cooperate with an investigation. The evidence at trial demonstrated that the PSP does provide cadets with some training regarding the distinction between mere encounters, investigatory detentions, and custodial arrests, using standard, approved materials shared by all instructors. This indicates that the PSP understands the importance of teaching cadets to correctly identify various types of encounters with citizens and to understand the constitutional limits on police authority in each type of encounter. But, the evidence in this case also demonstrates that the training provided is inadequate. The Court cannot find that the constitutional violation in this case was an aberration, based upon one officer's misunderstanding of Dr. Farvardin's Fourth Amendment rights. Two troopers, their supervisor, and, notably, Sergeant Duffy, who trains cadets at the PSP academy regarding constitutional limits on authority in various types of police encounters, shared in the erroneous belief that when a trooper is dispatched to check on a citizen's health and well-being, that encounter may be treated as an investigatory stop (or at least as occupying some "grey area" between a mere encounter and an investigatory detention).

Overall, the Court finds that Dr. Farvardin has proved that the PSP adopted a standardized training program that failed to engender in PSP officers an understanding of the limits on their authority under the Fourth Amendment in a scenario which is likely to be quite common (i.e., a trooper is dispatched to check on the well-being of a citizen). Even now, after time to reflect, a finding by the district attorney that this was a mere encounter, and court rulings in this civil rights litigation, those who testified at trial, including cadet trainer Sergeant Duffy, expressed a lack of clarity with regard to how the encounter involving Dr. Farvardin should be categorized. The officers' conduct was not merely a failure to apply their training in the heat of the moment, but the result of genuine confusion about Dr. Farvardin's rights during the

12

encounter.

The Court therefore holds that the PSP academy is providing inadequate training in identifying mere encounters and complying with constitutional limits on authority and use of force during such encounters, and the troopers and supervisor involved in the incident with Dr. Farvardin were inadequately trained. Deficient training resulted in the arresting officers' belief that they had the authority to detain Mr. Farvardin and require him to produce identification, and ultimately to employ force when he failed to cooperate. The Court further concludes that the deficient training was closely related to and had a causal nexus with Dr. Farvardin's constitutional injury.[5]

B.  Deliberate Indifference

Under § 1983, Dr. Farvardin must demonstrate not only that Commission Noonan failed to provide for adequate training of state troopers, but also that the Commissioner's failure to adequately train the PSP demonstrates deliberate indifference to the rights of citizens with whom the inadequately trained troopers would interact.

> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.[6]

Dr. Farvardin has presented no evidence of a pattern of similar constitutional violations,

---

[5] To the extent that Dr. Farvardin also claims that Commissioner Noonan failed to discipline or correct violations of law, as the troopers and supervisors involved in his arrest were not disciplined after the event, Dr. Farvardin failed to establish any causal relationship between the department's subsequent response to the incident and his constitutional injury. It is hard to imagine how later non-action could bear a causal relationship to the injury. Therefore, the Court will not find Commissioner Noonan liable for failure to discipline or correct the officers after the events at issue. However, the factual development at trial regarding the department's response to the incident are relevant to the Court's assessment of the Commissioner's liability for failure to train, as it suggests that the lack of clarity regarding a citizen's rights in a mere encounter extended beyond the troopers and supervisors involved in Dr. Farvardin's arrest.

[6] *Connick*, 131 S. Ct. at 1360 (internal quotations and citations omitted).

as is "'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."[7] However, liability for failure to train may be established based upon a single incident where the need for training (or more or different training) is so obvious that failure to provide it may be characterized as deliberate indifference to constitutional rights.[8] For example, in *Canton*, the Supreme Court posited, in the hypothetical, that the need to train officers in the constitutional limitations on the use of deadly force is so obvious that a failure to do so could provide a basis for single-incident liability.[9]

In *Connick v. Thompson*, another failure-to-train case, the Supreme Court distinguished the facts before it from the *Canton* hypothetical. In *Connick*, the prosecutors involved in Thompson's criminal case committed a *Brady* violation by failing to disclose a crime lab report to Thompson's counsel. Thompson argued that Connick, the policy maker for the district attorney's office, was deliberately indifferent to the need to train prosecutors regarding their *Brady* violations, and that lack of training caused his constitutional injury. Relying upon *Canton*, Thompson advanced a single-incident theory of liability for failure to train. The Supreme Court rejected this theory, reasoning, in relevant part, that: 1) unlike police officers, prosecutors are not required to make split-second decisions; 2) police academy applicants are unfamiliar with constitutional constraints on the use of force, and in the absence of training cannot acquire the legal knowledge they require; "in stark contrast, legal training is what differentiates attorneys from average public employees;"[10] and 3) the training requested was nuanced, not broad. The Supreme Court went on to say that "attorneys are trained in the law and equipped with the tools

---

[7] *Id.*

[8] *See, e.g., City of Canton v. Harris,* 489 U.S. 378, 390 (1989); *Thomas,* 749 F.3d at 223.

[9] *Canton*, 489 U.S. at 390 n.10.

[10] *Connick*, 131 S.Ct. at 1361 (internal quotation and citation omitted).

to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment"[11] and therefore "[a] licensed attorney making legal judgments, in his capacity as a prosecutor, about *Brady* material simply does not present the same "highly predictable" constitutional danger as *Canton*'s untrained officer,"[12] and further notes that "[t]he reason why the *Canton* hypothetical is inapplicable is that attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles."[13]

A recent Third Circuit case is also instructive. In *Thomas*, a prisoner brought a failure-to-train action after he was attacked by other inmates at the Cumberland County Correctional Facility following a several-minute long verbal argument which was witnessed by two corrections officers. Thomas suffered a concussion and eye injury, and was left blind in one eye. Thomas alleged that properly trained corrections officers could have used conflict de-escalation and intervention techniques to forestall the attack. The Cumberland County Correctional Facility provides three weeks of training to prospective corrections officers, but that training does not include training on de-escalation and intervention techniques. Thomas put forth a single-incident theory of failure-to-train liability, which required analysis of "'[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'"[14] The Third Circuit examined whether the facts of the case were more aligned with the facts of *Connick* or the hypothetical in *Canton* when analyzing whether the need for training was so obvious that failure to train could be characterized as deliberate indifference to constitutional rights. The court noted that the facts of Thomas's case fell "somewhere between

---

[11] *Id.*

[12] *Id.*

[13] *Id.* at 1364.

[14] *Thomas*, 749 F.3d at 223-24 (quoting *Bryan County v. Bd. of Cnty. Comm'rs of Bryan Cnty, Okl. v. Brown,* 520 U.S. 397, 409 (1997)).

the plainly obvious need to train armed police officers 'in the constitutional limitations on the use of deadly force' in *Canton* . . . and the lack of such an obvious need in *Connick*, where prosecutors had a legal education and ethical obligations and the allegedly necessary training was nuanced"[15] but concluded that Thomas's case was more similar to the hypothetical in *Canton*, because corrections officers have no reason to know how to de-escalate a conflict in the absence of training, and volatile conflicts are frequent events in that correctional facility.

The Court is persuaded that, as in *Thomas*, Dr. Farvardin's case for single-incident liability is more similar to the hypothetical in *Canton*. *Connick* involved the training of prosecutors, not police officers. As in *Canton*, the categorization of and constitutional constraints on police authority in various types of encounters with citizens would not be known to PSP officers in the absence of explicit training.[16] Although the PSP provided *some* training on the constitutional limits on authority in mere encounters, so the inadequacy is somewhat nuanced, the nuance here is about "the substantive of the training, not the particular instructional format"[17] and given the frequency with which PSP officers may encounter members of the public who are not suspected of wrongdoing, the Commissioner was (or should have been) aware that the risk of violating a citizen's Fourth Amendment rights in a mere encounter was a highly predictable consequence of failure to provide adequate trooper training regarding mere encounters. Furthermore, without improved training in the future, the constitutional violation suffered by Dr. Farvardin is likely to recur. Accordingly, the Court holds that the Commissioner was deliberately indifferent to an obvious risk posed by the failure to adequately train troopers regarding the categorization of and the constitutional limitations on authority and use of force in encounters

---

[15] *Id.* at 225.

[16] *Id.* at 225.

[17] *Connick,* 131 S.Ct. at 1363.

with citizens, as the failure to provide adequate training constituted "a failure to equip law enforcement officers with specific tools to handle recurring situations."[18]

C. Request for Injunctive Relief

Plaintiff seeks injunctive relief. Injunctive relief is appropriate when a plaintiff establishes a continuing violation of federal law.[19] In the Court's October 21, 2014 Memorandum Opinion and Order, the Court held that, at trial, Plaintiff established a realistic threat that he, while acting lawfully, may encounter a similar problem with state troopers in the future. The Court now supplements that conclusion of law with the holding that Commissioner Noonan, by continuing to inadequately train state troopers, is committing a continuing violation of federal law. Thus injunctive relief is appropriate.

**III. Conclusion**

For the reasons set forth herein, the Court holds Commissioner Noonan liable for violations of Dr. Farvardin's constitutional rights, specifically with respect to the failure to properly train PSP officers. Dr. Farvardin seeks injunctive relief, in the nature of improved PSP training, improved IAD investigation procedures, and on-going monitoring. The Court will grant appropriate injunctive relief through separate proceedings.

An appropriate Order follows.

---

[18] *Id.* at 224 (internal quotations and citations omitted).

[19] *Ex parte Young*, 209 U.S. 123, 159-60 (1908).